Fwd: Carrington College-Concerns

Jason Sonne <jasonsonne@gmail.com>
Mon 10/4/2021 3:17 PM
To: Max Williams <max@williamslawgroupboise.com>

# Jason Sonne'-Realtor

*Juniper Realty Group*

208-995-6327

Forwarded Conversation
Subject: Carrington College-Concerns
------------------------

From: **Jason Sonne** <jasonsonne@gmail.com>
Date: Wed, Dec 30, 2020 at 8:14 AM
To: <ceo@sjvc.edu>


To Mark and/or Mike Perry-

My name is Jason Sonne. I am an instructor at the Boise Carrington location in the dental hygiene program.

You came to our campus right after SJVC acquired Carrington and introduced yourselves and said if we ever needed to speak with you, to feel free.

I have a concern that I would like to share with you. We have lost many good instructors recently (4 total) and my concern is more are on their way out. We have a leadership issue in that there are unethical and unsafe practices happening. Several of us (7) wrote to HR back in August voicing concerns. All of our concerns were all dismissed.

I am happy to fill you in with direct examples if you are interested. As the owners, I feel you have a right to know how leadership is handling issues within Carrington College.

Best,
Jason Sonne

EXHIBIT A001

----------

From: **Mike Perry** <CEO@embered.com>
Date: Wed, Dec 30, 2020 at 8:26 AM
To: Jason Sonne <jasonsonne@gmail.com>


Hi Jason
Thanks for reaching out to me. I am certainly concerned about the situation that you have described.
I will be talking to Mitch and others about it today.
Thanks again for caring enough to bring this to my attention.
Mike

Michael D Perry
President & CEO
Ember Education - San Joaquin Valley College, Inc.
sjvc.edu carrington.edu embered.com

---

From: Jason Sonne <jasonsonne@gmail.com>
Sent: Wednesday, December 30, 2020 7:15 AM
To: Mike Perry
Subject: Carrington College-Concerns

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you believe this message is a phishing attack or malicious, please forward it to email.security@embered.com
<mailto:email.security@embered.com>


----------

From: **Jason Sonne** <jasonsonne@gmail.com>
Date: Wed, Dec 30, 2020 at 8:45 AM
To: Mike Perry <CEO@embered.com>


Thank you for the quick response and caring enough to check into this. I have been told numerous times that HR was sending my concerns off to someone who would contact me and no one ever did.

You may want to ask to see a letter that Rolina Schnuerle wrote to Helen Fairchild and others when Rolina resigned, as it outlines the major concerns very well.

Best,
Jason

EXHIBIT A002

Jason Sonné
12670 West Deep Canyon Drive
Star, ID 83669

February 26, 2021

To Whom It May Concern,

After careful consideration and much angst, I regretfully submit my resignation effective February 26, 2020. Please allow me to expound on the many reasons that I am absolutely forced to resign from Carrington College after almost six years as both a clinical as well as didactic instructor.

First, let me say, this has been the best and most rewarding job I have ever had, thank you for the opportunity. I have absolutely loved teaching and have found it to be my passion. However, my time at Carrington has also recently been filled with much turmoil and feelings of a hostile and unfair work environment. It has also become abundantly clear that Carrington College does not take safety seriously. The safety of our students, our patients and our faculty has been compromised time and again and yet no changes have occurred, even when these concerns have been clearly spelled out for upper management. I fear for the safety of our patients, students, and faculty. I also fear that my own licensure could be in jeopardy.

The dental hygiene program has recently lost four excellent and dedicated faculty and I will be the fifth. The common thread to everyone's departure is that we have a program director that rules like a dictator rather than a democratic manager and does not place safety where it should be, at the forefront.

Here are some examples:

- Rachel Watkins waited for Carrington College to change ownership so that she could re-hire her friend, Vicki Van Hoogen. Vicki had previously been fired multiple times and was not even allowed to be on the campus. When SJVC acquired Carrington, Rachel took advantage that there would be no record and rehired Van Hoogen. Van Hoogen created many safety concerns, from telling a student to "just make up the medication," to admitting she did not attend faculty meetings so she could "not be held accountable if I messed up in clinic," to being the faculty who carelessly sat a patient in the wrong chair during mock baords and subsequently that patient had someone else's contaminated instrument used in his mouth, to dropping opratory barriers on the dirty clinic floor and picking them up and using them, to telling a student to use the incorrect end of an instrument, to not being clinically competent (my opinion and many other faculty) at finding calculus (the **main** part of our job in helping students pass boards). When Van Hoogen started back, she asked no questions, and we were told she could just take a row of students without having to shadow anyone (normal procedure for new hires) Please

EXHIBIT B001

note, it had been 7+ years since Van Hoogen had been employed there. I personally brought my concerns to Rachel Watkins and was met with irritation. We were told as a faculty that we should not question Vicki and that we needed to leave Vicki alone because Vicki was feeling "picked on." Vicki was often found on her phone during clinic and not giving one on one instruction. Christy Corley and Regina Snyder would verify this. I can only assume that Rachel had some sort of desire to pay back Van Hoogen since Van Hoogen had covered for Rachel during a time when Rachel had an affair with a student, something Rachel told me and others personally. This was not a secret.

- We had a patient in clinic that had contaminated instruments (see above) that were from another patient placed in his mouth during a mock board exam. When it was discovered, Rachel Watkins directed Christy Corley to tell the patient that "We are not certain the instruments were dirty, but just wanted you to know there was a potential." A 100% untruth that put this patient's safety and health in dire jeopardy.

- We had a student that several instructors thought was unsafe while administering anesthetic. I personally brought my concerns to the program director where I was met with a lackadaisical response. We were told during a staff meeting with Barry Brooks present that we were to "just pass her" as "she is too far along, and we cannot keep her back since she has already repeated a term." From that point forward, only Wanda O'Hara and Vicki Van Hoogen were allowed to watch the student's injections. To my knowledge, this student has since been asked to leave one office and not return. There is documentation that will back up the fact that several instructors felt she was a safety hazard.

- I was personally asked to help in the DA program on many different occasions. Barry Brooks personally thanked me in an email dated September 8, 2020, for "my willingness to simply roll up my sleeves and jump right in to help." There were numerous instances of cross contamination and serious safety/infection control concerns that I witnessed firsthand. Students attempting to use unsterile and contaminated instruments on eachother, constant touching of paperwork or other items with contaminated gloves, etc. I verbally brought these concerns up several times to both Rachel Watkins and Barry Brooks as well as Miranda Luci and Elisa King. At one point, Christy Corley and I put together a power point presentation to deliver basic infection control information to the students since they were and are clearly not receiving the information. At that time and to present, students did not even know or had ever heard of **Standard Precautions,** a basic of infection control. Eventually, while responding to an email from Elisa King on September 13, 2020, I wrote and said I was concerned with many open beverage containers all spread out in the lab and classroom. Elisa King cited reasons for lack of infection control as "we often have a difficult time with infection control because of the lack of healthcare experience in our students, despite reviewing the information at the beginning of each mod. We have had an especially hard time recently because of Miranda being sick, the COVID quarantine, me being out on maternity leave and our huge class sizes. From that point forward, I was never asked to help in DA again, but instead one of our newest

instructors, Angela, was asked to help. Rachel Watkins will attempt to tell you this was because Angela is a DA, but Regina Snyder is also a DA but was rarely asked to help compared to myself.

- Back during our time off due to Covid, it became clear that students were cheating during online exams and quizzes in Embryology. Many students were completing a 50 question Embryology exam in 12-18 minutes, quite impossible given the material. I brought this to the attention of Rachel Watkins and was informed via email that because ▓▓▓▓ ▓▓▓▓(since has graduated) could not use the lockdown browser on her iPad, we could not use the browser at all. The students were knowingly allowed to cheat all during the online portion of the term.

- Shantel Robinson personally told me that she had been potentially exposed to Covid and that Rachel Watkins had asked her to keep that private. To my knowledge, Rachel Watkins has quarantined twice. When I was potentially exposed to Covid via my wife, I was told that I would have to quarantine for 14 days and use my sick pay or until I received a negative result to be able to return to work. On the same day I was told this information, I decided to get tested so I could return to work quickly. I spent two hours waiting at an urgent care all to be told in an email from Rachel that I didn't need to quarantine after all and I didn't need to be tested in order to return to work, I could return the following day. It became painfully obvious that the rules were being made up as time went on and were different for different people. It was not until I questioned the policy that I was told hours later that I could return to work without testing. I followed up with HR multiple times to inquire and ask about the written Covid policy. I finally received a an email from Alana Shcrock several weeks later to let me know that there was no written policy. After the email from Alana Schrock, I received a phone call from Lea Marshall letting me know there was no written policy. She also asked me how things were going and I replied, "terrible", to which she responded that she would escalate my concerns to upper management. I never heard anything.

- During senior WREB boards in July 2020, soon after we returned from being on leave due to the pandemic, Rachel Watkins allowed the students to utilize the ultrasonic scalers even though the school had a **no use policy** in place. In fact, Rachel sent three separate emails dated June 16, June 23, and again on June 29, 2020 where she clearly states, *"Please note that we are currently not allowing use of the ultrasonic or air-powder polish, these are all high aerosol-producing procedures, so for now, we need to avoid them."* This was totally reckless on the program director's part and put our students, patients, and faculty at risk during the middle of a very serious pandemic. It was serious enough to send out the policy on at least three occasions. Rachel even verbalized that she was going to break the rules and allow the students to utilize ultrasonics because she feared they would do poorly if not allowed to use them.

- Unless the policy has changed again, every student who had been exposed to Covid was required to quarantine for 14 days. On December 1, 2020, I informed Rachel Watkins that I had tested positive for Covid. I told her that I developed symptoms on Nov 26 after she inquired. I was at work the day prior on November 25, potentially exposing students

EXHIBIT B003

and faculty. Rachel was concerned that the WREB board exam was scheduled for December 4-6 and was concerned that if the students had to quarantine (as per usual guidelines), they would miss their exam. No students missed the exam to my knowledge; ███████, one of the students I was in contact with confirmed she was never told about the potential exposure. Were the faculty I was around even informed? This is very concerning as it again puts students, patients and faculty in harms way and is reckless.

- On October 30, 2020, several men in hazmat suits showed up to remediate mold in a classroom in the North building. Shantel Robinson told me personally that she had become so ill, she vomited and had a headache. Dr. Lewis, the clinic dentist, called Rachel Watkins to express her concern at the toxic smells that were being emitted through the ventilation system. Students as well as faculty complained of headache and repiratory irritation. There were elderly patients in the clinic as well as children that were being treated. Rachel Watkins told Dr. Lewis to have the clinic stay open. Rachel was not even present that day nor was Barry Brooks. When I arrived to work the following Monday, November 2, I was immediately met with a distinct smell like bleach. I developed a headache and was concerned enough that I called and reported this to OSHA.

- The clinic was out of compliance with regards to CODA standards ratios on multiple occasions. **According to section 3-6 of the CODA-Dental Hygiene Accreditation Standards**: *The faculty to student ratios must be sufficient to ensure the development of competence and ensure the health and safety of the public. In preclinical, clinical, and radiographic clinical and laboratory sessions, there must not be less than one faculty for every five students.*

    On 10-16-20, Rachel Watkins sent out an email where she admitted having a clinic with a 10:1 ratio. This was also happening most of this current Freshman I term that started in January 2021. On preclinic days, there was a ratio of 8:1 and 7:1 due to shortage of faculty from resigning. Regina Snyder, preclinic DH instructor can verify this. There were also <u>multiple</u> other dates such as 10-12-20, 10-20-20, 10-21-20, 10-22-20, 11-3-20 to name a few. These were clinics where the ratios were not maintained. A common theme seemed to be that whenever Vicki Van Hoogen or Wanda O'harra called out, Rachel would cover for them, but when other instructors called out, she would not. We were also often not told when an instructor had called out or was being sent over to DA, only to find out once clinic had started.

- The clinic was out of compliance with regards to CODA number of students enrolled proportionate to the resources available. **According to section 2-5 of the CODA-Dental Hygiene Accreditation Standards**: *The number of students enrolled in the program must be proportionate to the resources available.*
    During the start of the new cohort in April or May of 2020, 35 students were admitted into the program when we only have 30 chairs. This made it very difficult and some students had to pair in groups of three, cutting down on their practice time.

- There is a senior review given where instructors come in and review previous courses to help prepare senior students for the National Board Exam. **According to section 3-7 of the CODA-Dental Hygiene Accreditation Standards**: *All dental hygiene program faculty members must have:*
  *a) current knowledge of the specific subjects they are teaching*
  *b) documented background in current educational methodology concepts consistent with teaching assignments*
  According to Rachel Watkins, Dr. Jim Ryan does not possess the proper credentials to teach Microbiology, however, she consistently has him give a two plus hour review to the seniors in preparation for their National Board Exam.

- Due to ongoing ordering issues, students have been left many times frustrated that they do not have the proper size gloves in clinic and have had to wear gloves that were not the correct size, making their job even more difficult. Because of lack of maintenance and outdated equipment, amenities are often patched back together instead of being properly fixed. An example is our dental software, Dentrix. In an Aug 3, 2019 email from Rachel Watkins, she sites ongoing issues with regards to lack of "being able to take/scan/print x-rays for the better part of the last month, we will consider your x-ray requirements complete at this point, regardless of what you have left to complete." This is one example of students being allowed to progress in the program without properly completing required assessments. When we returned from Covid leave in June 2020, we were instructed by Rachel Watkins that students who needed certain requirements, for example sealants, could do one skill evaluation but have it counted for two different requirements in two different terms. For example, on 11-25-20, I personally signed off two skill evals when the student, ▆▆▆▆▆▆▆, in fact did just one, because I was directed to do so by Rachel Watkins. This was the established protocol to get the students caught up. This seems unethical at best. It also poses a risk for the students and patients because the students are not performing **all** assessments as required but have been allowed to cut them in half basically and the reason given was Covid.

The above examples are those of safety. Safety for students, patients that we treat and faculty in general. Safety concerns that were brought up in the past to HR. There are also reasons I will site within the intuitions HR department that have left me questioning who is manning the boat.

- On August 10, 2020, I emailed a letter of concern to HR. It is my understanding multiple other instructors (seven total) emailed HR with similar concerns.
- On August 20, 2020, I had a phone call with Thomas Corbett.
- On September 4, 2020, I emailed Mr. Corbett with concerns of retaliation. Nothing was ever done.
- On September 10, 2020, I had a phone call with Lea Marshall. I reviewed what I had discussed with Thomas Corbett and was told my concerns would be escalated. I never heard from anyone.

EXHIBIT B005

- On September 23, 2020, I had a possible exposure to Covid. I was told I would need to quarantine or get a negative test result. I was also told I would need to use my sick pay while quarantining. I questioned Rachel Watkins about the policy. I was then told to return to work the following day without being tested-See email 9-23-2020
- On September 23, 2020, I emailed HR to inquire about the written policy and Covid and pay.
- On September 25, 2020, I received a reply from Ashley Villarreal with HR stating my request had been sent to the HR director and to the Director of Safety.
- On October 2, 2020, I received a letter dated 9-29-20 from Alana Schrock stating "my allegations were not substantiated due to lack of evidence or facts being provided."
- On October 6, 2020, I emailed HR again to say that I had not heard from anyone regarding written Covid policy.
- On October 7, 2020, I emailed Alana Schrock to ask if both of my claims were addressed in the letter and to please send me written Covid policy. On that same day I received a response from A. Schrock that there was no written policy on Covid pay.
- On October 13, 2020, I received a phone call from Lea Marshall asking how things were going and to tell me there was no written Covid policy. I told her things were not going well and that there were continued issues. She stated she would escalate my concerns to upper management. I never heard anything after that.
- On October 15, I received an email from Kylie Locke with HR. She said she had been asked to reach out to me regarding the Covid written policy. I told her I had been informed there was no written policy and it seemed there were different protocol for different employees. She responded that she was escalating my question/concern and "as soon as I hear back, I will let you know." I never heard back from her.
- On October 16, 2020, I called Lea Marshall to ask about full-time policy on overages. During this call, Lea asked how things were going. I told her things were "terrible" and that I felt "targeted" due to several instances. I was told by Lea Marshall that she would escalate my concerns and have someone look into them. I never heard back from anyone.
- At some point in November (if my memory serves me correctly) 10 days of Covid pay appeared in my accruals on my timecard with no explanation. My fellow coworkers had "Covid pay" but no one besides me had any hours according to my coworkers. Regina Snyder sent an inquiry to HR about this. We then received an email from Rachel Watkins where she stated we should send our questions to her not HR.
- On December 1, 2020, I sent a message to Rachel Watkins informing her that I had tested positive that evening for Covid 19. She asked who I had been in contact with and I told her students names and faculty as well. Her concern was that if the students had to quarantine, they would miss their WREB clinical exam. According to one of the students, ███████, she was never informed. Why?
- On December 3, 2020, I sent an email to Lea Marshall, Helen Fairchild, Tara Miceli, and Mitch Charles. I supplied copies of a text message where Rachel Watkins told me I wouldn't be made to use PTO and stated in text, "what they don't know won't hurt them," since I had worked over my 25 hours and had been given a new class with such

EXHIBIT B006

- short notice. I was given Embryology with just three days' notice to prepare. I received an email that my concerns were being forwarded to employee relations for follow up. I have never heard from anyone.
- On December 30, 2020, I emailed Mike Perry, owner of Carrington College. Mr. Perry responded to my email and thanked me for bringing the matter to his attention. That same day, I received an email from Mitch Charles that he and Tara Miceli were going to be "reviewing the matter and following up from there." I have never heard back from anyone.

As is evident by my above timeline, I reached out for help multiple times. I stated on multiple occasions that things were not good. I was discriminated against by Rachel Watkins who told me via a text message on May 8, 2020, when asked by her if I wanted to back out of teaching Embryology since it was on such short notice, and I responded and asked if I had a choice, I was sent a text that said, "Welllllll, you can always quit. You're independently wealthy, you don't need the job-right???" This is far from the truth and is offensive and discriminatory at best. I have demonstrated several unethical behaviors, but the greatest concern once again, is that of safety.

Respectfully,

Jason Sonné



WILLIAMS LAW GROUP

April 20, 2021

**EMAIL TO:** JAshby@hawleytroxell.com

San Joaquin Valley
c/o Carrington College
1122 N. Liberty St.
Boise, Idaho 83704

CT Corporation System
c/o San Joaquin Valley College, Inc.
921 S Orchard St
Ste. G
Boise, ID 83705

*RE: Constructive Discharge of Jason Sonne, Damages, and Demand for Payment*

Dear Mr. Ashby,

My firm, Williams Law Group, PLLC, has been retained by Mr. Jason Sonne ("**Mr. Sonne**") regarding his resignation from Carrington College ("**Carrington**") on February 16, 2021. As detailed below, due to dangers Carrington exposed to patients, students, and staff through improper and unlawful directives, Mr. Sonne's departure can be viewed as nothing other than a constructive discharge of his position and employment. Further, Carrington retaliated against Mr. Sonne for reporting these dangers to his immediate supervisor and to Carrington's Human Resource department. This letter serves as a demand for compensation in lieu of further legal action being taken against San Joaquin Valley College ("**SJVC**") and its subsidiaries. Please direct all correspondence in this matter to my office and advise SJVC and Carrington employees to cease all contact with Mr. Sonne.

Mr. Sonne's discharge claim against Carrington is based, in part, on Carrington's willful failure to take action against its Director of Dental Hygiene, Rachel Watkins ("**Ms. Watkins**"), for multiple flagrant incidents that put the public, Carrington's students, and its staff in physical, mental, and legal jeopardy. These failures by Carrington put Mr. Sonne in an impossible position between choosing his career and, of paramount and utmost concern, the safety and health of the general public that utilize the free, no-cost dental work performed by Carrington students and staff.

Many of the issues detailed below were brought to the attention of Carrington's HR department by Mr. Sonne in August 2020. His complaints were part of at least seven (7)

MAX@WILLIAMSLAWGROUPBOISE.COM
208-269-1835

ATTORNEY AT LAW
MAX T. WILLIAMS

202 N. 9ᵀᴴ ST.
STE. 204
BOISE, ID 83702

EXHIBIT C001

other complaints to HR by various Carrington employees. These complaints were never addressed.

Additionally, Mr. Sonne continued to repeatedly notify Carrington management regarding the failed oversight and management of the school and its program. Some examples include:

- Mr. Sonne complained to Carrington HR regarding retaliation in September 2020 with no action taken by Carrington;
- On September 23, 2020, Mr. Sonne was potentially exposed to COVID-19 and was told to quarantine using his own sick pay. When Mr. Sonne questioned that policy with Ms. Watkins, he was told to return to work the next day without COVID testing;
- Failure of Carrington to have a stated COVID policy regarding student, patient, and staff safety and employee policies prior to August 2020;
- On December 1, 2020, Mr. Sonne notified Ms. Watkins of a positive COVID test and informed Ms. Watkins of contact with multiple students and faculty members. As all students showed up for WREB boards, it is assumed that Ms. Watkins took no action. This is further supported by a text message from a student to Mr. Sonne stating that she was not informed of potential COVID exposure;
- On December 30, 2020, Mr. Sonne contacted Carrington College owner, Mr. Mike Perry, via email regarding all the concerns and actions above, and more. Mr. Perry responded thanking Mr. Sonne for bringing up the matters. No action was taken by Mr. Perry.

On February 26, 2021, Mr. Sonne submitted his formal letter of resignation ("**Resignation Letter**") to Carrington and addressed to Carrington and SJVC via email.

In the Resignation Letter, Mr. Sonne tediously detailed multiple actions and inactions taken by Carrington and/or SJVC regarding the improper care, supervision, and direction of Carrington's program director, Ms. Watkins. The complaints included, but are not limited to, the following:

- Failure to instruct students on *Standard Precautions* regarding cross contamination and safety/infection control. Multiple students attempting to use unsterilized and contaminated instruments on each other. Admission of faculty, Vanessa King, that lack of infection control was due to lack of healthcare experience in students, Miranda being out sick with Covid, Elisa King's absence due to maternity leave with no proper measures in place to address infection and contamination safety protocols and controls;
- Rampant student cheating on tests and exams during Covid time-off period;
- Shantel Robinson told by Rachel Watkins to not disclose that Shantel was potentially exposed to COVID to staff or students and to continue working. This resulted in potential Covid exposure to staff and students, specifically Mr. Sonne. When told about getting tested, Ms. Watkins told Mr. Sonne not to quarantine and come to work;
- Ms. Watkins directed students to use of ultrasonic scalers during senior WREB boards in July 2020 even though there was a directive by Ms. Watkins that "Please

note that we are currently not allowing use of the ultrasonic or air-powder polis, these are all high aerosol-producing procedures, so for now, we need to avoid them.", due to the COVID pandemic;
- On or about October 30, 2020, Ms. Watkins failed to notify staff, students, and patients of potential mold in a classroom adjacent to the public clinic and continued to keep the clinic open while the mold remediation was being performed by persons in hazmat suits;[1]
- Director Barry Brooks and Ms. Watkins instructed Mr. Sonne, initially, then the entire faculty was told to "just pass" a student, ▓▓▓▓▓▓▓▓, in spite of the fact that ▓▓▓▓ exhibited uncontrollable shaking hands and only Vicki VanHoogen and Wanda O'Harra were allowed to observe ▓▓▓▓ injections from that point on;
- Student to teacher ratio violated and continues to violate CODA-Dental Hygiene Accreditation Standards, Section 3-6, by having a 10 student to 1 teacher ratio;
- Class overcapacity in violation of CODA, section 2-5, allowing 35 students in a classroom with only 30 chairs and no additional resources;
- Failure to properly certify faculty members in violation of CODA, section 3-7, as a Dr. Jim Ryan did not, at the time, possess credentials suitable to be a Microbiology instructor;
- Ms. Watkins informed Christie Corley to advise a patient that contaminated or used instruments may have been used on said patient.

Each of these complaints on their own would amount to an unsafe, dangerous, and severe work environment that put the health of patients at risk, as well as improperly training students and placing staff members licensures at risk of being revoked. These are serious implications by the willful and intentional misconduct of Carrington and SJVC. The fact that Carrington is putting patients' lives in serious risk, especially during a pandemic, gives rise to SJVC's liability vis-à-vis Carrington.

As previously stated above, Mr. Sonne notified Carrington's HR department and upper management about all of the issues above, and more, yet nothing was, or has been, done to ameliorate or rectify the situation besides the recent termination of Mr. Barry Brooks, Campus Director of Carrington, Boise campus. Thus, Mr. Sonne had no choice but to resign his position and leave. His failure to do so would have put his career, reputation, and license in jeopardy and his concern for the health and safety of the patients made it necessary for him to leave. This is nothing short of Mr. Sonne's constructive discharge by Carrington and SJVC.

Constructive discharge in Idaho is straight forward. "Constructive discharge occurs when the working conditions deteriorate to the point that they become sufficiently extraordinary and egregious to the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer."[2] Under Idaho law, Mr. Sonne's decision to resign due to Carrington's repeated and continuous failures to prevent harm to its vulnerable patients, its decision to place

---

[1] *Dad Blames Dorm Mold for Daughter's Death From Adenovirus – Here's What an Expert Says*, Health.com, February 22, 2021, 5 Health Dangers of Mold | Health.com.
[2] Poland v. Chertoff, 494 F.3d 1174, 1185 (9th Cir. 2007); *see* Hatheway v. Bd. of Regents of the Univ. of Idaho, 155 Idaho 255, 264 (2013).

EXHIBIT C003                               April 20, 2021 - Page 3

profit over the proper education and training of Carrington student's, and placing its staffs' livelihood in jeopardy, is considered a formal discharge for remedial purposes.[3]

Due to Carrington's continued intentional conduct of putting patients, students, and staff in danger through illegal medical directives, improper use and handling of medical equipment, passing students who showed a clear inability to perform the work required, and retaliation against staff who complained about these unlawful practices, amongst other things, is a direct violation of Idaho public policy. Any action by an employer against an employee for refusing an illegal act or performing an important public obligation is prima facie evidence of an adverse employment action in contravention of Idaho public policy.[4]

As such, this letter serves as a demand for compensation for the constructive discharge of Mr. Sonne. To avoid additional litigation then presently before SJVC and Carrington, along with the media exposure that will assuredly follow the filing of a lawsuit against those entities, Mr. Sonne demands to be compensated in the amount of Three Hundred and Fifty-Thousand dollars ($350,000.00). The amount demanded contemplates Mr. Sonne's tenure at Carrington and his inability to find comparable compensation in a lateral move to another position. Additionally, Mr. Sonne's earning capacity is grossly diminished as his age and gender will be prohibitive in finding comparable employment. Additionally, Mr. Sonne cannot physically continue to work the full schedule demanded by Carrington due to documented back pain when conducting clinical work. Mr. Sonne has attempted to find alternate employment but has been turned away at every corner as male dental hygienists are not in high demand and his age and physical limitation have made it difficult for him to obtain tenure at another institution.

Additionally, Mr. Sonne has documented surgery for carpal tunnel that has limited his ability to carry out physical activities related to dental hygiene and instruction for normal periods of time. This further exacerbates his employment situation as his physical ailments pose a significant impediment to finding comparable employment. His teaching job at Carrington was meant to be his retirement plan. Now he is forced to find work in a highly competitive, and often discriminatory, dental hygiene industry that makes his likelihood of finding a similar position unlikely.

Please be aware that the amount demanded above provides a sufficient pre-litigation remedy to Mr. Sonne and will avoid any unnecessary legal actions being taken against SJVC and Carrington. Should this matter proceed to litigation, we assuredly expect Mr. Sonne's damages to increase. Settlement is more palatable right now as there is an outstanding claim from another plaintiff already before your client. Multiple lawsuits will easily result in high litigation costs to SJVC and Carrington. It is also likely that additional claims may arise through discovery and as more information and evidence come to light. Mr. Sonne reserves all rights and remedies not expressly stated herein.

Finally, you are put on notice of your obligation, as I'm sure you are aware, to preserve all relevant documents, electronic data, communications, records, objects, and other material that may be used to support Mr. Sonne's claims. You must take immediate steps

---

[3] Waterman v. Nationwide Mut. Ins. Co., 146 Idaho 667, 672 (2009).
[4] *See, e.g.*, Bollinger v. Fall River Rural Elec. Coop., Inc., 152 Idaho 632, 640 (2012).

to ensure that all information, objects, and documents (including emails and electronically stored information, including without limitation all emails, communications and correspondence) are preserved and retrievable. Electronic information includes, but is not limited to, emails, word processing documents, spreadsheets, databases, calendars, networks, storage media, smart phones, laptops, personal computers, and other information storage devices. The failure to properly preserve such evidence carries particularly harsh penalties to be imposed by the courts if you are found to be in violation of this requirement, including, but not limited to, the inference that the destroyed evidence was unfavorable to you.[5]

Please respond to this letter via email to max@williamslawgroupboise.com or by telephone at 208-615-2590 within a reasonable time of receipt of this demand. Feel free to contact me with any questions you may have or to discuss settlement. I look forward to with you Mr. Ashby.

Sincerely yours,

Max T. Williams
*Attorney for Jason Sonne*

---

[5] *See* Courtney v. Big O Tires, Inc., 139 Idaho 821, 825 (2003) (explaining the doctrine of spoilation, i.e., destruction of evidence); *see also* Bromley v. Garey, 132 Idaho 807, 812 (1999).



**Commission on Dental Accreditation**

**Via Email Delivery:** jasonsonne@gmail.com

August 16, 2021

Mr. Jason Sonne
12670 W. Deep Canyon Drive
Star, ID 83669

Dear Mr. Sonne:

At its August 5, 2021 meeting, the Commission on Dental Accreditation (CODA) considered your *"Formal Complaint"* against the dental hygiene program sponsored by the Carrington College of Boise, Boise, Idaho. Careful attention was also given to the correspondence received from the dental hygiene program in response to the formal complaint.

The Commission determined that the program *may* not be in compliance with Standards 2-5 (admissions) and 3-6 (faculty).

Accordingly, the Commission directed that further investigation into the program's compliance with the Accreditation Standards as noted above through an additional report. The Commission will consider the requested information at its next regularly scheduled meeting for February 10, 2022. You may access the program's accreditation status as a result of this review which will be posted within 14 days of the meeting date at the following web address: http://www.ada.org/en/coda/find-a-program/

If you have questions, you may reach me by email at smithmi@ada.org or by telephone at 312-440-2695.

Sincerely,

Michelle Smith, RDH, MS
Manager, Allied Dental Education
Commission on Dental Accreditation

MS/ds

cc: Dr. Jeffery Hicks, chair, Commission on Dental Accreditation (CODA)
 Dr. Susan Kass, chair, Review Committee on Dental Hygiene Education, CODA
 Dr. Sherin Tooks, director, CODA

211 East Chicago Avenue Suite 1900 Chicago, Illinois 60611-2637
**Main** 312.440.4653 **Fax** 312.587.5107 ADA.org/CODA  EXHIBIT D001

# EXHIBIT B

D. John Ashby, ISB No. 7228
Taylor Barton, ISB No. 11259
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5200
Email: jashby@hawleytroxell.com
       tbarton@hawleytroxell.com

Attorneys for Defendant San Joaquin Valley College, Inc.

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF

IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| JASON SONNE,<br><br>Plaintiff,<br><br>vs.<br><br>SAN JOAQUIN VALLEY COLLEGE, INC.,<br>a California corporation,<br><br>Defendant. | Case No. CV01-21-16825<br><br>NOTICE OF NOTICE OF REMOVAL |

TO PLAINTIFF ABOVE-NAMED AND HIS COUNSEL OF RECORD; AND THE CLERK OF THE DISTRICT COURT IN AND FOR THE COUNTY OF ADA:

PLEASE TAKE NOTICE that on February 16, 2022, the above-named Defendant caused to be filed in the United States District Court for the District of Idaho a Notice of Removal, a copy of which (excluding its exhibits) is attached as **Exhibit 1**.

NOTICE OF NOTICE OF REMOVAL - 1

46019.0009.14507143.1