UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JASON SONNE,<br><br>                  Plaintiff,<br><br>v.<br><br>SAN JOAQUIN VALLEY COLLEGE,<br>INC., a California corporation,<br><br>                  Defendant. | Case No. 1:22-cv-00062-DCN<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## I. INTRODUCTION

Before the Court is Defendant San Joaquin Valley College, Inc.'s Motion for Summary Judgment. Dkt. 12. The Court held oral argument and took the matter under advisement. Dkt. 24. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

### A.  Factual Background

Defendant San Joaquin Valley College, Inc. operates a private vocational college, commonly known as Carrington College (hereinafter "Carrington"), in Boise, Idaho. Carrington provides instruction and training to students in a variety of programs, including dental hygiene. Carrington's dental hygiene program offers both classroom and clinical

MEMORANDUM DECISION AND ORDER - 1

education, with students performing dental hygiene services on patients while under the supervision of Carrington's instructors.

Beginning in 2015, Plaintiff Jason Sonne was a dental hygiene instructor, and at-will employee, at Carrington.[1] In approximately 2020, Sonne became concerned about certain aspects of Carrington's dental hygiene program, and, on August 10, 2020, he submitted a letter outlining such concerns to Carrington's employee relations department. A few other employees submitted similar letters around the same time. Dkt. 12-3, Ex. A.

Sonne's August 10, 2020 letter stated he was aware that five dental hygiene students had recently failed their board exams, and suggested this decline in board passage rates was related to a "new hire sometime around ten months ago." Dkt. 12-6, Ex. 5. In addition, Sonne's letter noted: "We have another instructor that gossips with the students, says inappropriate things to students, sits around in clinic rather than teaching and instructing and does not hold students accountable."[2] *Id*. Sonne's letter also alleged Carrington had

---

[1] On or about October 27, 2021, Sonne and Rolina Schnuerle, another former dental hygiene instructor at Carrington, filed separate suits against Carrington in Idaho state court. Both suits alleged the same six claims against Carrington, and both were filed by Max. T. Williams of Williams Law Group. Carrington subsequently removed Sonne and Schnuerle's cases to this court. *Sonne v. San Joaquin Valley College, Inc.*, 1:22-cv-00062-DCN, at Dkt. 1; *Schnuerle v. San Joaquin Valley College, Inc.*, 1:22-cv-00070-DCN, at Dkt. 1. Although Sonne and Schnuerle's cases arise out of a similar general fact pattern, the two cases have not been consolidated. In addition, Schnuerle's complaint was based, in part, on incidents only she, and not Sonne, witnessed. While such incidents are described in Sonne's Complaint, the Court does not analyze them here because they involved only Schnuerle, and not Sonne. Dkt. 1-3, ¶¶ 19–22.a, 22.c, 22.j. Further, as explained in the Court's Memorandum Decision and Order granting Carrington's Motion for Summary Judgment in Schnuerle's case, such incidents do not support even Schnuerle's claims against Carrington, let alone Sonne's claims. *See Schnuerle v. San Joaquin Valley College, Inc.*, 1:22-cv-00070-DCN, at Dkt. 26.

[2] Sonne's letter did not identify either the problematic "new hire," or the instructor who gossiped with students and acted inappropriately in clinic. During his deposition, Sonne testified the problematic new hire was Vicki Van Hoogen, and clarified Wanda O'Herra was the instructor who had gossiped with students and acted inappropriately in the dental hygiene clinic. Dkt. 12-5, at 45:10–18, 48:16–21.

allowed a student who had not learned how to properly give injections to pass. *Id*. Sonne's August 10, 2020 letter did not allege unlawful discrimination or otherwise report a violation of a specific law, policy, or regulation. *Id*.

Upon reviewing the letters from Sonne and others, Carrington's employee relations department investigated the matter, including by interviewing Sonne, other Carrington instructors, and Carrington's Director of Dental Hygiene, Rachel Watkins. Dkt. 12-3, Ex. A. During the course of the investigation, Sonne submitted emails to the investigator, Thomas Corbett, stating he believed he was being retaliated against for his August 10, 2020 letter by Watkins. Dkt. 12-6, Ex. 9 and Ex. 10.

Specifically, Sonne emailed Corbett on September 4, 2020, and alleged Watkins was retaliating against him for complaining by requiring him to submit his timecard for his paid time off ("PTO"). Dkt. 12-6, Ex. 9. Sonne's email explained that Watkins had previously told him would not have to submit PTO for a planned vacation due to overtime hours Sonne had worked in preparation for teaching a new class. *Id*. When Sonne reminded Watkins of their previous conversation, she apologized and stated she had checked with Campus Director Barry Brooks and learned Carrington's policy required employees to submit their PTO. *Id*. Sonne acknowledged during his deposition that Watkins' alleged retaliation simply required him to follow Carrington's official policy regarding PTO. Dkt. 12-5, at 65:18–21.

In addition, Sonne sent a follow-up email to Corbett on September 4, 2020, complaining Watkins retaliated against him by telling him he could not eat in the office. Dkt. 12-6, Ex. 10. As with his claim regarding PTO, Sonne conceded during his deposition

that Carrington had a "policy of no eating in the office." Dkt. 12-5, at 61:9–19, 67:7–14.

During a subsequent interview with Corbett, Sonne also complained that, after he submitted his August 10, 2020 letter, Watkins retaliated against him by taking over a course Sonne had taught for five years and assigning him Embryology—a much more difficult course he did not usually teach—without notice. Dkt. 19-1, at ¶ 10. However, Sonne testified during his deposition that he was assigned Embryology when his hours were cut, at the beginning of the pandemic, to 25-hours per week. Dkt. 12-5, at 59:24–60:17. Sonne confirmed that he was later brought back up to full-time status for the fall 2020 semester, after he submitted his August 10, 2020 letter. *Id*. at 145:21–146:6. Thus, it appears that Watkins assigned Sonne the new course several months before he submitted his August 10, 2020 letter.

Sonne's claims of retaliation were included as part of Carrington's investigation. Dkt. 12-3, Ex. A. Ultimately, Carrington's investigation determined Sonne's allegations were not substantiated. *Id*.; Dkt. 12-6, Ex. 7. The investigation concluded that Sonne had not shown either that there were any policy violations or that he had been retaliated against in any way. *Id*. Although the investigation did not substantiate any policy violations, Watkins was informed at the end of the investigation there was a perception amongst some employees that she favored Van Hoogen. Dkt. 12-3, ¶ 4. Carrington provided Watkins with coaching on how to communicate more effectively with her team to eliminate any perception of favoritism. *Id*. The internal investigation was closed on September 29, 2020. Dkt. 12-3, Ex. A.

On December 3, 2020, Sonne sent an email to Lea Marshall, a Carrington Human

Resources employee, and again complained about being forced to use his PTO for a planned vacation. Dkt. 12-6, Ex. 16, at 77–78. Sonne suggested "[o]ut of the blue or when she found out letters had been written, [Watkins] started following protocol and told me I needed to use my PTO for vacation time I had taken in August." *Id*. Sonne's December 3, 2020 email also expressed concern about "unsafe behavior," such as an incident on October 30, 2020, when "men show[ed] up in hazmat suits to remediate mold while patients, students and faculty were in the dental clinic." *Id*. Sonne alleged that although one faculty member got sick, and several other faculty and students had headaches and burning eyes, Watkins "made the decision to allow clinic to continue even though [Watkins] was not personally on campus that day." *Id*. Sonne acknowledged during his deposition that he was not present for the alleged "mold remediation" incident but heard about it from other instructors. Dkt. 12-5, at 80:6–10.

Carrington explains that it never had a mold remediation. Instead, the incident Sonne referred to involved repairs to water damage in a classroom near the clinic. Dkt. 12-2, ¶ 14; Dkt. 12-3, Ex. B, at 23. The smell that allegedly made an instructor sick and gave others burning eyes and headaches, "was due to a chemical that was being used that was not hazardous." Dkt. 12-2, ¶ 14. "Additionally, all necessary precautions were taken by the third-party doing the repair, including venting the room with negative pressure to ensure there were no fumes." *Id*. When, after an afternoon break, several individuals stated that the smell had improved, it was agreed by all to continue with clinic that day. *Id*. Although Sonne complains Carrington's management failed to communicate to faculty and students that the smell was not due to mold-remediation or a hazardous chemical, he does not

dispute Carrington's characterization of the incident on summary judgment. Dkt. 19-1, ¶ 17.

Sonne's December 3, 2020 email also submitted "documentation" of Watkins allowing a student to teacher ratio that was too high. Dkt. 12-6, Ex. 16, at 76. The documentation Sonne's email referenced is an October 16, 2020 email from Watkins reminding faculty of the importance of having an appropriate student to faculty ratio and instructing faculty to ensure adequate clinic coverage. *Id*.; Dkt. 12-5, at 84:5–23. In fact, Sonne testified during his deposition that he felt "retaliated against" when, on the same day she sent her email, Watkins asked him to come back to Carrington's clinic to ensure an adequate student to faculty ratio. Dkt. 12-5, at 84:24–86:3.

Finally, Sonne's December 3, 2020 email expressed concern that Watkins inappropriately allowed students to use ultrasonic[3] instrumentation for their Western Regional Examining Board ("WREB") exams during the COVID-19 pandemic. Dkt. 12-6, Ex. 16, at 78. Carrington explains that Watkins did allow students to use ultrasonic instrumentation during their July 2020 WREB exams, but only after she first contacted WREB and confirmed both that WREB did not have a policy on the use of ultrasonic equipment, and that the decision on whether to allow the use of ultrasonic instrumentation was up to the school. Dkt. 12-6, Ex. 17. Watkins then received approval from Carrington leadership to allow the use of ultrasonic instrumentation during the WREB exams. *Id*. at

---

[3] In the field of dental hygiene, an "ultrasonic" is a scaling device that uses ultrasonic vibration to break up hardened calculus deposits on patients' teeth. Christopher Zielinsky, How Ultrasonic Scaling Benefits Patients and Dental Hygienists Alike, Sable News (March 28, 2019, 8:45 AM), https://sableidustriesinc.com/blog/ultrasonic-scaling-benefits-patients-dental-hygenists.

Ex. 18. Sonne testified that regardless of "whether [Watkins] got permission or not . . . I personally think that it would be unethical to allow the use of an instrument that produces an enormous amount of airborne aerosols during the height of an airborne pandemic." Dkt. 12-5, at 94:1–6. However, Sonne acknowledged that, outside of Carrington's own internal policy, he was not aware of any policy prohibiting the use of ultrasonic instrumentation during the WREB exams. *Id*. at 87:19–25. Sonne also confirmed that Carrington is free to change its internal policy regarding the use of ultrasonic instrumentation as it sees fit. *Id*. at 88:8–15.

The day after he submitted his December 3, 2020 email to Marshall, Sonne commenced a 12-week leave of absence, from December 4, 2020, to February 25, 2021, under the Family Medical Leave Act. Dkt. 12-2, ¶ 18. Sonne's leave was related to a family member, as opposed to his own health condition. *Id*.

During his leave, Sonne emailed Carrington's owners on December 30, 2020, stating Carrington had "lost many good instructors recently (4 total) and my concern is more are on their way out." Dkt. 12-6, Ex. 19. Sonne's December 30, 2020 email also maintained "[w]e have a leadership issue in that there are unethical and unsafe practices happening." *Id*. Although Sonne did not identify any specific unethical or unsafe practices, his email stated, "I am happy to fill you in with direct examples if you are interested." *Id*. When one of Carrington's owners responded, Sonne stated: "You may want to ask to see a letter that Rolina Schnuerle wrote to Helen Fairchild and others when Rolina resigned,

as it outlines the major concerns very well."[4] *Id*. Sonne confirmed during his deposition that he had never seen Schnuerle's post-resignation letter.[5] Dkt. 12-5, at 75:17–25.

At the time of Sonne's December 30, 2020 email, Carrington was already investigating the concerns raised in Schnuerle's post-resignation letter. Dkt. 12-3, ¶ 6. Carrington maintains that because Sonne simply asked Carrington's owners to look into Schnuerle's post-resignation letter, which Carrington was already doing, there was nothing more for Carrington to do other than to proceed with the investigation it was already conducting. *Id*.

Carrington's investigation of Schnuerle's post-resignation letter included interviews with multiple employees, including Sonne, Schnuerle, Watkins, and two other faculty members. Dkt. 12-3, Ex. B. On January 11, 2021, the investigation concluded that Watkins had not violated any policy.[6] *Id*. While it did not find any policy violations, Carrington provided Watkins with coaching to address the incidents raised in Schnuerle's post-resignation letter and to ensure that no such issues arose in the future. Dkt. 12-3, Ex. C. For

---

[4] Sonne was referring to a November 19, 2020 post-resignation letter Schnuerle sent Carrington after she resigned on November 5, 2020 (hereinafter "Schnuerle's post-resignation letter"). *See Schnuerle v. San Joaquin Valley College, Inc*., 1:22-cv-00070, Dkt. 13-6, Ex. 11.

[5] In his Statement of Disputed Facts, Sonne maintains he testified that he did not see Schnuerle's "August 2020 letter but was aware of it and may have discussed it with Rolina or other faculty." Dkt. 19-1, ¶ 20. However, Sonne referred to Schnuerle's November 19, 2020 post-resignation letter—not her August 2020 letter—in his December 30, 2020 email to Carrington's owners. Dkt. 12-6, Ex. 19. As noted, Sonne conceded during his deposition that he had never seen Schnuerle's post-resignation letter. Dkt. 12-5, at 75:17–25.

[6] Although Sonne contends Carrington's investigation was "inadequate" because Carrington did not "interview all witnesses and unilaterally concluded [Schnuerle's] claims were unsubstantiated," Sonne does not identify any witnesses Carrington should have, but did not, interview during its investigation of Schnuerle's post-resignation letter. Dkt. 19-1, ¶ 21. During his deposition, Sonne also confirmed that he did not know who Carrington interviewed during the investigation. Dkt. 12-5, at 57:2–13.

instance, Carrington coached Watkins regarding the importance of following best practices and policies—particularly with respect to maintaining appropriate faculty to student ratios, ensuring that students were provided with excellent instruction and clean/sterile equipment, and ensuring that students and faculty were held to high standards. Dkt. 12-3, ¶ 7.

Sonne's approved FMLA leave of absence ended on February 25, 2021. *Id*., ¶ 10. On February 26, 2021, instead of returning to work as anticipated, Sonne submitted a letter of resignation. Dkt. 1-5, Ex. B. Sonne testified that his resignation was effective immediately. Dkt. 12-5, at 108:12–15. In his resignation letter, Sonne listed a variety of concerns, which Carrington maintains were either: (1) already investigated in conjunction with the letters Sonne and other employees submitted in August of 2020; (2) investigated in response to Schnuerle's post-resignation letter; or (3) never reported by Sonne prior to his resignation. Dkt. 12-2, ¶ 24.

Specifically, Sonne's resignation letter complained that Watkins favored Van Hoogen. Dkt. 1-5, Ex. B. This allegation was included as a part of Carrington's investigation of Sonne and others' August 2020 letters and was ultimately found to be unsubstantiated. Dkt. 12-3, Ex. A. Sonne's resignation letter also added new criticism of Van Hoogen, such as that she had once dropped operatory barriers on the floor and used them on a patient, and also used the incorrect end of an instrument on the patient. Dkt. 1-5, Ex. B. During his deposition, Sonne confirmed that he did not report the latter incident to anyone at Carrington prior to his resignation. Dkt. 13-5, at 109:22–110:1.

Next, Sonne's resignation letter again reported that a student who was "unsafe while

administering anesthetic" was improperly passed. Dkt. 1-5, Ex. B. This allegation was already reported by Sonne in his August 10, 2020 letter and investigated, where it was determined there was no policy violation. Dkt. 12-3, Ex. A; Dkt. 13-5, at 113:8–15. During his deposition, Sonne confirmed that the student in question told him she felt her hands shook as a result of her nervousness due to scrutiny from Sonne and other instructors. *Id*. at 50:16–24. Sonne conceded that the student filed a complaint against him, alleging that he was targeting her. *Id*. at 52:23–53:10. In response to Sonne and others' reports about the student's hand shaking, Watkins informed Carrington instructors that the student should be failed if she could not perform injections on her own, Dkt. 12-6, Ex. 6, but also asked the instructors to independently examine the student's performance to ease the pressure on the student. Dkt. 12-4, ¶ 10. The instructors did so and stated they felt the student should receive a passing grade. *Id*.

Sonne's letter also alleged that students were cheating during their online exams and quizzes in Embryology. Dkt. 1-5, Ex. B. Although Sonne testified that he reported the cheating to Watkins, he could not recall when he reported the cheating to Watkins or whether he had raised the cheating issue to anyone else at Carrington prior to his resignation. Dkt. 12-5, at 118:23–119:12.

Sonne's resignation letter next alleged, again for the first time, that Watkins told another Carrington instructor (Shantel Robinson) not to get tested after Robinson was potentially exposed to COVID-19. Dkt. 1-5, Ex. B. Sonne confirmed during his deposition that he was unaware Carrington investigated this concern when it was first raised by Schnuerle in her post-resignation letter. Dkt. 12-5, at 120:17–24; Dkt. 12-3, ¶ 5; Dkt. 12-

3, Ex. B. During Carrington's investigation, Robinson denied that Watkins had told her not to get tested for COVID-19, and maintained she had never heard Watkins tell any staff member not to be COVID tested or not to disclose COVID exposures at work.[7] Dkt. 12-3, Ex. B.

Sonne's resignation letter also reported, for the first time, that some students may not have been informed of their potential COVID-19 exposure when Sonne tested positive for COVID. Dkt. 1-5, Ex. B. During his deposition, Sonne confirmed he was unaware that Watkins did report Sonne's positive COVID-19 test to leadership and that Carrington consulted with an independent health consultant to determine whether the students needed to quarantine. Dkt. 12-5, at 125:15–127:8; Dkt. 12-6, Ex. 24. The consultant determined the students did not need to quarantine. Dkt. 12-6, Ex. 24.

Sonne's resignation letter also repeated his December 3, 2020 allegations regarding the use of ultrasonic instrumentation during a WREB board exam. Dkt. 1-5, Ex. B. As noted, Sonne acknowledged during his deposition that, outside of Carrington's own internal policy, he was not aware of any policy prohibiting the use of ultrasonic instrumentation during the WREB exams. Dkt. 12-5, at 87:19–88:7. In connection with its

---

[7] Although Sonne suggests both he and Schnuerle testified that Watkins told Robinson not to get tested, and that the disparity between such testimony and Carrington's summary of Robinson's interview in its investigation report creates a genuine issue of material fact, neither Sonne nor Schnuerle deposed, or submitted an affidavit from, Robinson. Regardless, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby*, 477 U.S. at 247–248 (emphasis in original). As further discussed below, because Sonne has not identified a legal source for the public policy Carrington purportedly violated, and because Sonne could not have been discharged—even constructively—for reporting Watkins' alleged statement since he did not report such statement until he resigned, Sonne fails to state a public policy claim even if Watkins did tell Robinson not to get tested for COVID-19.

investigation of Schnuerle's post-resignation letter, Carrington concluded that Watkins only allowed students to use ultrasonic instrumentation during the July 2020 WREB exams after first contacting WREB and confirming that WREB did not have a policy prohibiting the use of ultrasonic equipment. Dkt. 12-2, ¶ 17; Dkt.12-4, ¶ 8; Dkt. 12-6, Ex. 17. Watkins then received approval from Carrington leadership to use ultrasonic instrumentation during the WREB exam. Dkt. 12-6, Ex. 18.

Sonne's resignation letter also repeated the allegations raised in his December 3, 2020 email regarding the alleged mold remediation incident on October 20, 2020. Dkt. 1-5, Ex. B. As detailed above, Carrington explains, and Sonne does not refute, that Carrington never had a mold remediation incident, but instead repaired a water leak, while also taking all available safety precautions. Dkt. 12-2, ¶ 14; Dkt. 12-3, Ex. B, at 23; Dkt. 19-1, ¶ 17.

While admitting that Watkins had sent out an email on October 16, 2020, directing Carrington faculty to ensure adequate student to teacher ratios, Sonne identified, for the first time in his resignation letter, five dates when student to teacher ratios were purportedly too high during Carrington's dental clinic. Dkt. 1-5, Ex. B; Dkt. 12-5, at 129:22–130:4. Citing Committee on Dental Accreditation ("CODA") standards, Sonne's resignation letter alleged this student to teacher ratio violated CODA 3-6. Dkt. 1-5, Ex. B. Sonne also raised two additional alleged violations, including of CODA section 2-5, which states the number of students enrolled must be proportionate to the resources available, and CODA section 3-7, which requires certain credentials for dental faculty. Dkt. 1-5, Ex. B. It is undisputed that Sonne did not report such specific CODA violations to anyone at Carrington prior to his resignation. Dkt. 12-5, at 129:22–131:16; Dkt. 12-2, ¶¶ 33–34; Dkt. 19-1, ¶¶ 36–37.

Around the same time that he resigned, Sonne also submitted a complaint to CODA in which he reported the alleged CODA violations identified for the first time in his resignation letter.[8] Dkt. 12-6, Ex. 25.

Finally, Sonne's resignation letter raised concerns related to Watkins' purported failure to order adequate supplies for students, and maintained Watkins instructed Sonne and others to allow students to progress through Carrington's program without completing proper assessments. Dkt. 1-5, Ex. B. Sonne did not report such issues to anyone at Carrington prior to his resignation. Dkt. 12-5, at 136:18–137:15; Dkt. 12-2, ¶ 36; Dkt. 19-1, ¶ 39.

### B. Procedural Background

On October 17, 2021, Sonne filed a complaint against Carrington in Idaho state court, alleging claims for: (1) "Constructive Discharge in Violation of Public Policy for Failing to Maintain Safe Work Environment"; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment; (4) Negligent Infliction of Emotional Distress; (5) Vicarious Liability; and (6) Negligent Supervision. Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Carrington removed Sonne's case to this Court on the basis of diversity.[9] Dkt. 1.

---

[8] While Carrington maintains CODA investigated Sonne's complaint and determined that Carrington was in compliance with respect to each of Sonne's allegations, Dkt. 12-2, ¶ 35, Sonne argues the Court should not consider the CODA report since it was dated August 17, 2022—nearly a year and a half after Sonne submitted his CODA complaint. Dkt. 19-1, ¶ 38. Because, as explained below, Sonne's claims fail as a matter of law, the Court does not consider the factual issue of whether or not CODA determined Carrington was in compliance.

[9] Sonne filed an Amended Complaint (Dkt. 1-3) against Carrington on February 5, 2022—before Carrington removed Sonne's case to this Court on February 18, 2022. Dkt. 1. Sonne's Amended Complaint alleges the same six causes of action against Carrington.  Dkt. 1-3.

The parties subsequently submitted a joint litigation plan, which included a July 1, 2022 deadline for amending pleadings, a November 18, 2022 deadline for factual discovery, a December 16, 2022 deadline for expert discovery, and a December 16, 2022 deadline for dispositive motions. Dkt. 8. The Court entered a Scheduling Order adopting each of the parties' stipulated deadlines. Dkt. 10. To date, Sonne has never filed a motion to amend, a motion to extend the deadline for completing discovery, or a motion to continue any of the Scheduling Order deadlines.

On December 16, 2022, Carrington filed the instant Motion for Summary Judgment. Dkt. 12. Sonne did not respond to the Motion for Summary Judgment until he was alerted by the Court that he had missed his response deadline. Dkt. 13. The Court ultimately allowed Sonne additional time to respond to Carrington's Motion for Summary Judgment. Dkt. 18.

After Carrington's Motion for Summary Judgment was fully briefed, the Court heard oral argument on April 17, 2023.[10] During oral argument, Sonne's counsel withdrew Sonne's claim for negligent infliction of emotional distress. The Court accordingly considers whether Sonne's remaining five claims survive summary judgment.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[10] With the parties' consent, the Court held a joint hearing on Carrington's Motion for Summary Judgment in the instant case, as well as on Carrington's Motion for Summary Judgment in *Schnuerle v. San Joaquin Valley College, Inc*., 1:22-cv-00062-DCN.

Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. However, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the respondent cannot simply rely on an unsworn affidavit or the pleadings; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). If the nonmoving party cannot make a showing on an element essential to his or her claims, there can be no genuine issue of material fact "since a complete failure of proof concerning an essential element on the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## IV. ANALYSIS

Carrington seeks summary judgment on each of Sonne's remaining claims, which the Court will address in turn. Before doing so, however, the Court highlights three critical flaws in Sonne's response to Carrington's Motion for Summary Judgment.

First, Sonne's counsel appears to misunderstand the procedural posture of this case, and repeatedly contends the Court should deny summary judgment because additional discovery is needed. For instance, in his Statement of Disputed Facts, Sonne suggests "further discovery and investigation" is required regarding various issues. Dkt. 19-1, at ¶¶ 22, 31, 38. In his response brief, Sonne contends "other witnesses can testi[fy] about the inadequacy" of Carrington's investigation. Dkt. 19, at 16. However, Sonne fails to identify such witnesses, and appears not to have deposed any of them. During oral argument, Sonne's counsel also argued that the factual record has not been adequately developed, and stated he would like to depose approximately five unidentified individuals but hadn't done so previously because he believed the case was going to settle.

Sonne's suggestion that additional discovery may create a genuine issue of material fact ignores that each of the discovery deadlines in this case passed *before* Carrington filed its Motion for Summary Judgment. To date, Sonne has never asked the Court to extend any of the discovery deadlines. After Carrington filed its Motion for Summary Judgment, Sonne also never filed a motion pursuant to Federal Rule of Civil Procedure 56(d) to request additional time to obtain affidavits, declarations, or to take discovery.

Moreover, even if Sonne's belated references to a need for further discovery could themselves be considered a request for additional discovery under Rule 56(d), the request is appropriately denied because Sonne has failed to both specify the discovery he seeks, and to show how such discovery is essential to oppose summary judgment. *See* Fed. R. Civ. P. 56(d); *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc*., 874 F.3d 604, 619–620 (9th Cir. 2017) (explaining that to prevail on a Rule 56(d) request, a

party must set forth in an affidavit the specific facts it hopes to elicit from further discovery, and must also show that such facts exist and are essential to oppose summary judgment).

Given Sonne's failure to ever attempt to extend the discovery deadlines, or to file a Rule 56(d) Motion, the time for deposing witnesses or obtaining other discovery has expired. As such, Sonne cannot create a genuine issue of material fact by claiming further discovery is needed.

Second, in addition to suggesting additional discovery is necessary to develop his claims, Sonne repeatedly faults Carrington's counsel for allegedly asking Sonne "narrowly tailored questions which were inherently misguided and focused on events not alleged by Plaintiff" during his deposition. Dkt. 19, at 18, *id*. at 19 (suggesting "Defendant attempts to use Plaintiff's deposition testimony as a sort of smoking gun to soundly dispose of Plaintiff's claims. But Defendant asked questions and solicited answers to its questions regarding elements of claims Plaintiff never brought"), *id*. at 4 (accusing Carrington of "inaccurately utilizing deposition testimony that was non-exhaustive").

Sonne thus appears to argue Carrington did not obtain the testimony he has to support his claims because Carrington's counsel asked the wrong questions during his deposition. Yet, Sonne's counsel did not depose Sonne—or apparently any other witnesses—before responding to Carrington's Motion for Summary Judgment. Dkt. 19. Nor did Sonne's counsel elicit testimony during Sonne's deposition to clarify or buttress his claims. *See generally* Dkt. 12-5. If Sonne had testimony or other evidence to support his case, it was his counsel's duty to obtain and submit it. That Sonne apparently failed to conduct his own discovery is not a reason to deny Carrington summary judgment.

MEMORANDUM DECISION AND ORDER - 17

*Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant[.]").

Third, and finally, Sonne criticizes Carrington for "applying the wrong legal analysis regarding Plaintiff's claim of constructive discharge," and for "discussing how Plaintiff cannot survive summary judgment because of a claim he never alleged." Dkt. 19, at 4–7. Specifically, Sonne suggests Carrington erroneously interprets his claim for "constructive discharge in violation of public policy for failing to maintain safe work environment" under the framework Idaho courts use to evaluate claims for wrongful termination in violation of public policy. *Id*. Yet, Idaho does not appear to recognize a claim for constructive discharge in violation of public policy,[11] and Sonne's response brief does not cite a single case or other legal authority to suggest otherwise.[12] *Id*. Sonne also

---

[11] This Court, sitting in diversity, must apply the substantive law of Idaho. *Nw. Acceptance Corp. v. Lynnwood Equip., Inc*., 841 F.2d 918, 920 (9th Cir. 1988).

[12] During oral argument, Sonne's counsel referenced several cases—without providing case citations—that were not included in his response brief. Although the Court advised Sonne's counsel that he could file a notice of supplemental authority with the case citations within one week of oral argument, he did not do so. Nevertheless, the Court has located such cases and finds they do not support Sonne's constructive discharge in violation of public policy claim. Specifically, as further explained below, *Hummer v. Evans*, 923 P.2d 981, 987 (Idaho 1996), undermines Sonne's public policy claim because the plaintiff in *Hummer*, unlike Sonne, cited an Idaho statute as the legal source of the public policy at issue.

In two other cases Sonne's counsel cited, *Hollist v. Madison Cnty.*, 2013 WL 5935209 (D. Idaho Nov. 1, 2013) and *Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007), the plaintiffs claimed they were constructively discharged without due process, or in violation of a specific federal statute, but did not contend they were constructively discharged in violation of public policy. As such, neither case is helpful to Sonne's constructive discharge in violation of public policy claim.

The Court has also considered *Feltmann v. Petco Animal Supplies, Inc*., 2012 WL 1189913 (D. Idaho Mar.

MEMORANDUM DECISION AND ORDER - 18

fails to identify the elements of a claim for constructive discharge in violation of public policy, much less offer evidence to establish a genuine issue of material fact with respect to such elements.

Although the Court further addresses Sonne's constructive discharge in violation of public policy claim below, in the absence of *any* authority to the contrary, the Court declines to extend Idaho's public policy exception to the at-will employment doctrine under the circumstances at issue here.

## A.   Constructive Discharge in Violation of Public Policy

It is undisputed that Sonne was an at-will employee.  Dkt. 12-2, ¶ 4; Dkt. 19-1, ¶ 4. In Idaho, an employer is generally free to terminate an at-will employee for any reason, or for no reason at all. *Thomas v. Medical Ctr. Physicians, P.A*., 61 P.3d 557, 563 (Idaho 2002); *Edmondson v. Shearer Lumber Prod*., 75 P.3d 733, 737 (Idaho 2003) (explaining an at-will employee may be terminated by his or her "employer at any time for any reason without creating liability"). "In Idaho, the *only* general exception to the employment at-

---

20, 2012), and finds it inapposite due to its disparate procedural posture. Specifically, in *Feltmann*, another judge of this District repeatedly expressed doubt that Idaho state courts would recognize a claim for constructive discharge in violation of public policy, *id*. at *6–7, but denied defendant's motion to dismiss because further factual development could potentially support plaintiff's claim, which plaintiff could also still amend. *Id*. By contrast, the discovery deadlines have expired in this case—as has the deadline for filing a motion to amend—and Sonne has never attempted to continue or reopen them. Unlike the plaintiff in *Feltmann*, Sonne cannot engage in further factual development to support, or amend, his constructive discharge in violation of public policy claim.

Finally, the Idaho Supreme Court recognized the public policy exception to at-will employment in *Jackson v. Minidoka*, 563 P.2d 54, 57 (Idaho 1977), but cited only general definitions of public policy that other jurisdictions have recognized, such as protecting employees who refuse to give false testimony, who file a workman's compensation claim, who refuse to date a superior, or who serve jury duty against the employer's wishes. *Id*. at 58. None of these examples are at issue here, and Sonne's counsel did not otherwise explain how *Jackson* supports Sonne's specific public policy claim.

will doctrine is that an employer may be liable for wrongful discharge when the motivation for discharge contravenes public policy." *Edmondson*, 75 P.3d at 737 (emphasis added). A claim for wrongful termination in violation of public policy represents "a narrow exception to the at-will employment presumption[.]" *Bollinger v. Fall River Rural Elec. Co-op, Inc.*, 272 P.3d 1265, 1271 (Idaho 2012). The exception is limited because if "not narrowly construed, the exception could eviscerate the [at-will employment] rule." *McKay v. Ireland Bank*, 59 P.3d 990, 994 (Idaho Ct. App. 2002).

    *1. Protected Activity*

    Because the public policy exception to at-will employment is narrow, the "public policy exception is triggered only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges." *Bollinger*, 272 P.3d at 1271. In determining whether an employee's activity is protected, Idaho courts first assess "whether there is a public policy at stake sufficient to create an exception to at-will employment." *Id*. (quoting *Thomas*, 61 P.3d at 565). Next, a court must consider "whether the employee acted in a manner sufficiently in furtherance of that policy." *Bollinger*, 272 P.3d at 1271. For the reasons explained below, Sonne fails to establish either element.

    a.  <u>Public Policy</u>

    The question "of what constitutes public policy sufficient to protect an at-will employee from termination is a question of law." *Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 361 (Idaho 2014). Although "many activities and interests engaged in

by employees benefit the community . . . not all of them are recognized as falling within the public policy exception." *Id*. (quoting *McKay*, 59 P.3d at 994). Instead, the "claimed public policy generally must be rooted in caselaw or statutory language." *Bollinger*, 272 P.3d at 1271 (quoting *Edmondson*, 75 P.3d at 738); *Mallonee v. State*, 84 P.3d 551, 557 (Idaho 2003) (explaining the public policy of Idaho "is found in [its] constitution and statutes").

Applying this principal, Idaho courts have addressed the public policy exception to at-will employment on several occasions. *See*, *e.g.*, *Watson v. Idaho Falls Consol. Hospitals, Inc*., 720 P.2d 632, 637 (Idaho 1986) (protecting participation in union activities); *Hummer*, 923 P.2d at 987 (holding the termination of an employee based on the employee's compliance with a court-ordered subpoena was contrary to the public policy of Idaho); *Ray v. Nampa Sch. Dist. No. 131*, 814 P.2d 17, 21 (1991) (finding plaintiff's public policy claim survived summary judgment where the plaintiff contended he was terminated for reporting safety code violations to the state electrical engineer, and where the employer admitted plaintiff was fired because he had "made contact with the state electrical engineer").

To recognize a public policy exception to at-will employment, Idaho courts require a legal source for the policy at issue. For instance, Idaho Code Section 44-701 protects union membership. Thus, in *Watson*, the Idaho Supreme Court upheld a jury instruction which provided that a termination based on an employee's union activities would be contrary to Idaho's public policy. 720 P.2d at 635. Similarly, in *Hummer*, the Idaho Supreme Court held the termination of an employee based on the employee's compliance

with a court-issued subpoena was contrary to the public policy of the state, as established by the legislature in Idaho Code Section 19-3010. 923 P.2d at 987.

Notably, in *Sorenson v. Comm. Tek, Inc*., 799 P.2d 70, 74 (Idaho 1990), the Idaho Supreme Court rejected an employee's claim that it was against public policy to offer an employee a new employment position with the understanding that the terms of the new position would be negotiated in the future, and to then fire the employee for attempting to negotiate. *Sorenson*, 799 P.2d at 74. In so holding, the *Sorenson* court explained the "claim that failure to negotiate is a violation of public policy, *in the absence of a statute* requiring employers to bargain with employers, is not supported by our prior cases." *Id*. (emphasis added) (collecting cases). The *Sorenson* court thus affirmed the lower court's entry of summary judgment in favor of the employer on the employee's wrongful termination in violation of public policy claim. *Id*.; *see also Weerheim v. J.R. Simplot Co., Inc.*, 2006 WL 2435506, at *4 (D. Idaho Aug. 22, 2006) (finding reporting safety concerns was an important public policy because there was a specific Idaho statute that required certain safety protocols).

However, in *Ray*, the Idaho Supreme Court reversed summary judgment on the plaintiff's public policy claim where the employer admitted the plaintiff was fired because he had reported building and safety code violations to the state electrical engineer. 814 P.2d at 21. As such, the *Ray* court held plaintiff's allegation that he was fired after raising specific safety and building code violations fit within Idaho's public policy exception. While *Ra*y, 814 P.2d at 21, suggests terminating an employee for reporting safety violations contravenes public policy, *Sorenson* and the other cases cited above imply that

the public policy of Idaho must itself be recognized by a specific statute. *Sorenson*, 799 P.2d at 74; *Watson*, 720 P.2d at 637; *Hummer*, 923 P.2d at 981; *Weerheim*, 2006 WL 2435506, at *4.

Regardless, Idaho case law is clear that to trigger the public policy exception to at-will employment, an employee must at least identify a legal source to support the employee's claim that the employer's actions violated public policy. *Bollinger*, 272 P.3d at 1272; *Venable*, 329 P.3d at 362 ("In order to properly state a claim under the public policy exception, a plaintiff must specifically identify the public policy in question[.]"); *Ray*, 814 P.2d at 121 (reversing summary judgment where it was undisputed plaintiff was terminated for reporting specific safety code violations to the state electrical engineer; ); *see also Lord v. Swire Pac. Holdings, Inc*., 203 F. Supp. 2d 1175, 1180 (D. Idaho Mar. 12, 2002) ("The Court is unable to find a clearly articulated legislative statement of public policy which would bring [plaintiff's] conduct within the ambit of the public policy exception to at-will employment. In the absence of case law or statutory language to support [plaintiff's] claim, the Court finds no basis for expanding the Idaho law that defines the public policy exception to the at-will doctrine").

Sonne vaguely alleges Carrington subjected him "to working conditions that violated public policy in that [e.g., Plaintiff was required to work in unsafe or unhealthful conditions without appropriate protective equipment]."[13] Dkt. 1-3, ¶ 41 (brackets in original). Sonne does not identify any specific statute, regulation, or policy Carrington

---

[13] Similarly, in his response to Carrington's Motion for Summary Judgment, Sonne broadly contends Carrington violated public policy by "failing to provide a safe work environment." Dkt. 19, at 7.

allegedly violated. The Idaho Supreme Court has expressly held an employee's reports of safety concerns are not sufficient to establish a public policy claim where, as here, the employee fails to link the employer's alleged safety violations to any specific legal requirement. *Bollinger*, 272 P.3d at 1272.

In *Bollinger*, the Idaho Supreme Court found the district court appropriately granted an employee's claim for retaliatory discharge and termination in violation of public policy where the employee failed to show she was engaged in "protected activity" under Idaho law. *Id*. at 1272. The plaintiff in *Bollinger* was the safety director for her employer, and her job duties included: (1) "implementing and carrying out state and federal laws and regulations, including conducting monthly safety meetings;" (2) overseeing safety programs required the Occupational Safety and Health Administration ("OSHA"); and (3) "performing safety and compliance inspections." *Id*. at 1267. The plaintiff was also responsible for reporting to management any "failure to comply with an applicable safety law, rule, or regulation." *Id*. According to the plaintiff, when she reported such issues, her General Manager "refused to take measures to remedy safety issues Bollinger brought to his attention, ignored requirements for equipment, and became hostile toward her." *Id*. When she was subsequently terminated, the plaintiff brought various claims against her employer, including claims for retaliatory discharge and wrongful termination in violation of public policy. *Id*. at 1268. The district court granted defendant summary judgment on each of plaintiff's claims. *Id*.

On appeal, the Idaho Supreme Court held the district court properly granted summary judgment on plaintiff's claims for retaliatory discharge and termination in

violation of public policy because she was not engaged in a protected activity when she was terminated. *Id*. at 1271. In so holding, the *Bollinger* court explained:

> Bollinger fails to pinpoint any particular statute or regulation that would support her claim that her reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment. Although we have recognized that reporting of safety violations may constitute protected activity, we also require identification of the source of the public policy that would trigger the exception. Bollinger's affidavit in opposition to summary judgment only vaguely asserts that [her General Manager] 'refused to implement or to follow safety rules and regulations of which [Bollinger] made him aware and ignored requirements for equipment; procedures; and regulations.' Nowhere in her briefing below or on appeal does Bollinger identify a legal source for those alleged rules and regulations.

*Id*. at 1272 (citing *Edmondson*, 75 P.3d at 738).

Like the plaintiff in *Bollinger*, Sonne alleges Carrington's management, and particularly Watkins, caused a litany of purportedly "unsafe or unhealthful conditions," but fails to identify a legal source for the safety practices Watkins and/or Carrington purportedly violated. Dkt. 1-3, ¶¶ 19–26, 28, 41. While Sonne's Complaint broadly contends Carrington's dental hygiene education and procedures are governed by the Commission on Dental Accreditation ("CODA"), and that Carrington's safety procedures are governed by OSHA, Sonne does not link the allegedly unsafe practices he witnessed to specific CODA or OSHA regulations.[14] *See generally*, Dkt. 1-3, Dkt. 19-1; Dkt. 19, at 5–7. Significantly, the Idaho Supreme Court held the plaintiff in *Bollinger* failed to create a

---

[14] In his resignation letter, Sonne did maintain Carrington violated three specific CODA regulations, regarding student to teacher ratios, appropriate resources, and staffing credentials. Dkt. 1-5, Ex. B. However, Sonne never suggests such CODA regulations are the legal source for his public policy claim. *See generally*, Dkt. 1-3, Dkt. 19, Dkt. 19-1. Further, as noted, Sonne did not report such alleged CODA violations until he resigned. Sonne cannot be found to have been discharged—whether constructively or actually—for reporting such alleged CODA violations when he did not identify such violations until he ended his employment with Carrington.

genuine issue of fact to suggest she engaged in a protected activity where, like Sonne, she generally suggested her employer violated OSHA, but failed to associate any of the employer's alleged violations with a specific OSHA regulation. 272 P.3d at 1272. In so holding, the *Bollinger* Court explained: "Although the state does have a general public policy interest in maintaining a safe workplace, the public policy exception would swing too wide if it protected advocacy of any of the infinite number of safety measures employers could take, regardless of whether they were required by law."[15] *Id*. at 1272.

Similarly, in *Venable*, an employee alleged her employer fired her because she refused to violate the Idaho Consumer Protection Act ("ICPA"). 329 P.3d at 361. While recognizing the ICPA "does establish public policy for the State of Idaho," the Idaho Supreme Court rejected plaintiff's wrongful termination in violation of public policy claim because the plaintiff was required to do more than "simply cite to a broad-ranging act, without specifying a specific provision or implementing regulation that was allegedly violated." *Id*. at 361. The *Venable* court explained, "[i]t is simply insufficient to point generally to an act comprising a chapter of the Idaho Code and leave it to the court to match up the alleged misconduct with an applicable provision of the chapter." *Id*. at 362.

Here, like the plaintiff in *Venable*, Sonne vaguely suggests Carrington violated CODA and OSHA, but generally fails to associate the purportedly unsafe conduct he witnessed with a specific provision of CODA or OSHA. *Id*. And, like the plaintiff in

---

[15] The Court does not doubt Sonne's genuine concern for the students and patients at Carrington. However, the fact that an employee was subjectively trying to do something good or to prevent harm is not enough to establish a public policy claim, absent a legal source for the policy at issue. *Bollinger*, 272 P.3d at 1272; *Lord*, 203 F. Supp. 2d at 1180 (noting a plaintiff's good faith belief in the righteousness of her conduct is too tenuous a ground upon which to base a public policy claim) (citation omitted)).

*Bollinger*, Sonne alleges he was subjected to various "unsafe or unhealthful" practices but fails to identify a legal source to show such practices were unsafe or unhealthy. *Bollinger*, 272 P.3d at 1272. Further, to the extent Sonne alleges Carrington violated its own internal policies—such as by allowing the use of ultrasonic equipment during a WREB exam—Sonne has not shown Carrington failed to honor any binding policy in place at the time of his resignation.[16] Even if he had, a mere failure to adhere to Carrington's private policies does not fall within any of the narrow public policy exceptions to Idaho's at-will employment doctrine. *Id*.

In short, while maintaining a safe work environment may constitute a public policy sufficient to expand the at-will employment doctrine, Sonne's public policy claim fails as a matter of law because he fails to identify *any* legal source to support his claim that his reports of safety issues implicated a public policy sufficient to justify an exception to at-will employment. *Id.* at 1272.

b.   Sonne's actions

Even if Sonne had identified a public policy sufficient to create an exception to at-will employment, he cannot show he acted in a manner in furtherance of that policy. *Bollinger*, 272 P.3d at 1271. Prior to his resignation, Sonne did not report any violations of specific laws, policies, or regulations. However, in his resignation letter, Sonne alleged, for

---

[16] As noted, Sonne admitted during his deposition that the use of ultrasonic instrumentation during a board exam did not violate any regulation or law, and that this was instead a matter left up to school policy. Dkt. 12-5, at 87:19–88:7. Sonne also confirmed that Carrington was free to change its policy regarding the use of such instrumentation, and that WREB itself did not have any rules against using ultrasonic instrumentation during the pandemic. *Id*. at 88:8–25. Thus, Sonne has not submitted evidence to suggest the use of ultrasonic instrumentation during a board exam was against even Carrington's internal policy.

the first time, that Carrington had violated CODA section 3-6 (requiring certain student to teacher ratios), CODA section 2-5 (requiring that students enrolled in a program must be proportionate to the resources available), and CODA section 3-7 (requiring certain credentials for dental hygiene faculty). Dkt. 1-5, Ex. B. Even if compliance with such CODA regulations could be considered a public policy sufficient to protect an at-will employee from termination, Sonne cannot show he acted "in a matter sufficiently in furtherance of that policy" because he did not report such alleged CODA violations until he resigned. *Bollinger*, 272 P.3d at 1271; *Thomas*, 61 P.3d at 565 ("[A]n employee who reports wrongful conduct that is protected under the public policy exception is protected by reporting the conduct to superiors within the company."). Because Sonne did not identify any specific alleged CODA violations until he ended his employment with Carrington,[17] he did not act in furtherance of the public policy of maintaining a safe work environment. It would fundamentally defeat the public policy of maintaining a safe work environment to allow a claim where the plaintiff did not report any alleged policy violations until he left the company. *Venable*, 329 P.3d at 580 (explaining that to establish she engaged in a protected activity, the employee needed to not only present evidence of the employer's misconduct, but also of her own conduct in furtherance of the identified public policy).

---

[17] Moreover, as noted, Sonne does not suggest these specific CODA violations are the legal source of his public policy claim. Instead, Sonne simply claims Carrington failed to maintain a safe work environment, and leaves it up to the Court to speculate whether such specific alleged CODA violations are the legal source for his public policy claim.

## 2. Causation

Further, even if Sonne had reported the alleged CODA violations identified in his resignation letter prior to leaving Carrington, Sonne's public policy claim fails because it is not enough for an employee to show he engaged in a protected activity; he must also establish that the termination or adverse employment action was in fact motivated by his participation in the protected activity. *Edmondson*, 75 P.3d at 739; *Bollinger*, 272 P.3d at 1272 (affirming summary judgment on plaintiff's public policy claim where plaintiff "failed to create a genuine issue of fact that her termination was motivated by her safety reports"). Although the question of causation is generally one for the jury, it may be decided as a matter of law where, as here, there is no genuine issue of disputed fact. *Bollinger*, 272 P.3d at 1271–72.

To establish a wrongful termination in violation of public policy claim, a plaintiff must show a causal relationship between her engagement in protected activity and her termination. *Id*. at 1271; *Venable*, 329 P.3d at 362 ("Even if Venable had tied a specific bullet point of alleged misconduct to a specific provision of the ICPA, she would need to have presented competent evidence to show that the employer violated the public policy and that she was terminated for engaging in protected activity."); *Summers v. City of McCall*, 84 F. Supp. 3d 1126, 1147 (D. Idaho 2015) (explaining a public policy claim requires a showing that the employer's motivation for the termination contravenes public policy). Here, it is undisputed that Sonne was not terminated by Carrington, and that he instead resigned. Dkt. 12-2, ¶¶ 23, 24; Dkt. 19-1, ¶¶ 23, 24. Thus, even if Sonne had established he engaged in protected activity, he cannot show he was discharged for

engaging in that activity. Not only has Sonne failed to show he engaged in a protected activity, but Carrington did not terminate Sonne's employment at all, much less as a result of any protected activity.

### 3. Constructive Discharge

In his response to Carrington's Motion for Summary Judgment, Sonne argues he does not allege a claim for wrongful termination in violation of public policy, but rather asserts a claim for "constructive discharge in violation of public policy for failing to provide a safe work environment." Dkt. 19, at 5. Sonne does not cite any authority in support of such claim. Nor does Sonne identify the elements of this claim, much less offer evidence to support the elements.

Moreover, even if Idaho would recognize a claim for constructive discharge in violation of public policy, it is untenable that Idaho courts would require a legal source for the public policy at issue with respect to a wrongful termination, but would not require a legal source for the public policy at issue with respect to a constructive discharge. Sonne does not address, much less attempt to explain, why a claim for constructive discharge in violation of public policy would not require a legal source for the claimed public policy. Sonne's claim thus fails as a matter of law regardless of whether Idaho courts would recognize a claim for constructive discharge in violation of public policy.[18]

---

[18] While, on summary judgment, Sonne repeatedly suggests Carrington subjected him to a "hostile work environment," he did not allege a hostile work environment claim. *Compare* Dkt. 19-1, ¶¶ 14, 15, 17, 34 and Dkt. 19, at 5 *with* Dkt. 1-3. In addition, while hostile work environments are prohibited under various federal anti-discrimination laws, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq*., or the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*., Sonne expressly states he "has never alleged

In addition, although he contends Carrington constructively discharged him by failing to maintain a safe work environment, Sonne was unable to identify any examples of him suffering any injury or having his own personal safety at risk during his deposition. Dkt. 12-5, at 148:18–149:7, 155:15–19. When asked to specify the "unsafe" conditions he was subjected to, Sonne stated, "probably the remediation of mold." *Id*. at 148:25–149:3. Yet, Carrington has shown it did not have a mold remediation incident, Dkt. 12-2, ¶ 14; Dkt. 12-3, Ex. B, and Sonne does not dispute Carrington's characterization of the incident on summary judgment. Dkt. 19-1, ¶ 34. Moreover, Sonne admitted the one-day alleged mold remediation incident occurred on a day when he was not even present in the workplace. Dkt. 12-5, at 80:6–10.

Sonne also contends he felt compelled to resign because he was "told to carry out duties [he] believed would be illegal, unlawful, or unethical[.]" Dkt. 19, at 5. Yet, Sonne does not cite any legal authority to suggest Carrington's practices were illegal, unlawful, or unethical. And, when specifically questioned whether Carrington ever ordered or required him to do something that he felt was illegal or unlawful, Sonne testified, "I don't know there was anything that was ever asked of me that I felt was against the law." Dkt. 12-5, at 154:15–19.

Although Sonne testified he believed Carrington asked him to do things he felt were "unethical," such as "passing students who shouldn't be passed, signing off on skill evaluations that weren't done, [and] knowingly letting students cheat," the only specific

---

discrimination as a member of [a] protected class or activity as the basis for his [constructive discharge in violation of public policy] claim." Dkt. 19, at 5.

student Sonne identified was the student whose hands shook when she administered injections. *Id*. at 154:20–25, 49:7–51:8. However, Sonne also confirmed: (1) he was not the instructor who passed the student, *id*. at 53:17–54:1; (2) he in fact failed the student, *id*. at 53:17–19; (3) he did not know whether the student's hand shaking issue improved when she was moved to new instructors after filing a complaint against Sonne for "targeting" her, *id*. at 53:1–54:12; and (4) he couldn't contest that Watkins told faculty not to pass the student if she couldn't perform injections, as Carrington has submitted evidence to show. *Id*. at 51:10–52:8; Dkt. 12-6, Ex. 6; Dkt. 12-4, ¶ 10. Thus, Sonne has not submitted evidence to show Carrington asked him to do anything unethical.[19]

Further, even if Idaho courts would recognize a claim for constructive discharge in violation of public policy, Sonne cannot establish he was constructively discharged. "Constructive discharge by itself is not actionable in an at-will employee situation." *Sherick v. Battelle Energy All., LLC*, 2009 WL 453768, at *3 (D. Idaho Feb. 20, 2008). The constructive discharge theory simply converts a resignation into a termination. *Knee v. Sch. Dist. No. 139*, 676 P.2d 727, 730 (Id. Ct. App. 1984).

Under Idaho law, "it is not appropriate to apply the doctrine of constructive discharge absent facts showing harassment, intimidation, coercion, or other aggravating conduct on the party of the employer which renders working conditions intolerable." *Id.* "Constructive discharge involves something more than normal harassment, and it does not

---

[19] To the extent Sonne contends he was asked to allow additional students to cheat, Sonne confirmed during his deposition that he did not report any issues with students cheating prior to his resignation letter. Dkt. 12-5, at 118:23–119:12. As explained above, Sonne cannot establish either the public policy or the causation elements of his constructive discharge claim when he failed to report such alleged misconduct until he resigned.

lie unless conditions are beyond ordinary discrimination." *Allred v. Home Depot USA, Inc*.,

2019 WL 2745731, at *13 (D. Idaho 2019) (cleaned up).

Similarly, the Ninth Circuit has held that:

Constructive discharge occurs when the working conditions deteriorate, *as a result of discrimination*, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and serve his or her employer. We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was tolerable.

*Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007) (emphasis added).

As noted, Sonne contends he has "never alleged discrimination as a member of [a]

protected class or activity as the basis for his [public policy] claim." Dkt. 19, at 5. Yet,

Sonne does not cite *any* authority to suggest Idaho courts recognize a claim for constructive

discharge in the absence of discrimination. The Court accordingly declines to extend the

constructive discharge theory to Sonne's public policy claim.

### 4. *Retaliation*

Finally, although Sonne suggests he was retaliated against for reporting his concerns

about Watkins, the record belies Sonne's allegations of retaliation. Specifically, Sonne

contends he was retaliated against for submitting his August 10, 2020 letter because, after

he submitted the letter: (1) Watkins required him to submit his time card for PTO; (2)

Watkins told him he could not eat in the office; and (3) Watkins took over a course he had

taught for five years and assigned him a much more difficult course (Embryology) to teach

without notice. Dkt. 19-1, ¶¶ 10–12.

With respect to his first two examples, Sonne admitted during his deposition that Watkins' alleged retaliation simply required him to follow Carrington's official policy regarding PTO, as well as Carrington's COVID-related policy of not eating in the office. Dkt. 12-5, at, 61:9–19, 65:18–21, 67:7–14, 68:21–23. Sonne does not explain how being required to comply with Carrington's policies can be considered retaliatory. In fact, while faulting Carrington for failing to comply with its own internal policies, Sonne simultaneously complains that Carrington was retaliatory when it applied such policies to him. For instance, although he criticized Carrington for having too high of a student to teacher ratio, Sonne ironically testified that he felt "retaliated against" when Watkins asked him to return to the clinic one day to ensure an adequate student to teacher ratio. Dkt. 12-5, at 84:24–86:4. With respect to his third example of Watkins' alleged retaliation, Sonne also cannot establish his Embryology assignment was retaliatory because Sonne testified Watkins assigned him this course in the spring of 2020, *before* Sonne complained about Watkins on August 20, 2020. *Id*. at 59:24–60:17, 145:21–146:6.

Further, like a claim of constructive discharge or a hostile work environment, retaliation claims are typically brought under federal antidiscrimination statutes, such as Title VII. *See, e.g., Miller v. Fairchild Indus., Inc*., 797 F.2d 727, 730 (9th Cir. 1986). To establish a prima facie case of retaliation, a plaintiff must show: (1) he engaged in a protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal relationship between the protected activity and the adverse employment action. *Id*. Even if Sonne had alleged a retaliation claim, or identified a statutory basis for such claim, the claim would fail because, as discussed above, Sonne has not established he

engaged in a protected activity. Significantly, Sonne also testified that he was never subjected to any employee discipline, including a write-up, a written warning, or any other disciplinary action while working for Carrington.[20] *Id*. at 147:24–148:2. As such, Sonne cannot establish the second and third elements of a retaliation claim, even if he had alleged one.

### 5. Conclusion

Sonne cannot show he engaged in a protected activity because he fails to identify a legal source for the public policy at issue. In addition, Sonne cannot show he acted in furtherance of the public policy of maintaining a safe work environment because it is undisputed that he did not report the majority of his safety concerns, as well as the only specific CODA violations he identified in his resignation letter, before leaving Carrington, and instead waited until after his 12-week leave of absence, and formal resignation, to do so. And, Sonne fails to establish his discharge—whether by termination or resignation— was caused by his allegedly protected activity because he did not engage in such activity until he resigned. Finally, Sonne has not identified any facts or caselaw to support his claim that he was constructively discharged. Due to Sonne's "complete failure of proof" on each of the essential elements of his constructive discharge in violation of public policy claim, this claim fails as a matter of law. *Celotex*, 477 U.S. at 323.

### B. Covenant of Good Faith and Fair Dealing

Sonne next alleges Carrington violated the covenant of good faith and fair dealing

---

[20] Sonne also confirmed that no one at Carrington ever indicated they were upset by his complaints or by his participation in Carrington's investigation of such complaints. *Id*. at 148:7–10.

when it failed to provide him with a safe work environment. Dkt. 1-3, ¶ 49. The covenant of good faith and fair dealing is implied in all contracts, including those for employment-at-will. *Cantwell v. City of Boise*, 191 P.3d 205, 215 (Idaho 2008). A violation of the covenant of good faith and fair dealing occurs when either party violates, qualifies, or significantly impairs any benefit or right of the other party under the employment agreement. *Bollinger*, 272 P.3d at 1271. The covenant does not create new duties that are not inherent in the employment agreement itself, and instead only arises in connection with the terms agreed to by the parties. *Id.*; *see also Jones v. Micron Tech., Inc.*, 923 P.2d 486, 492 (Id. Ct. App. 1996) ("The covenant of good faith and fair dealing does not inject substantive terms into the contract but, rather, requires only that the parties perform in good faith the obligations imposed by their agreement. Thus, the duty arises only in connection with terms agreed to by the parties.") (cleaned up).

Sonne's Complaint does not suggest Carrington deprived him of any of its contractual obligations. Dkt. 1-3, ¶¶ 47–51. Further, during his deposition, Sonne admitted that he was unaware of any contractual obligations Carrington allegedly breached. Dkt. 12-5, at 149:17–20. However, on summary judgment, Sonne argues his covenant of good faith and fair dealing claim is "based on Defendant owing Plaintiff the duty to provide a safe work environment[.]" Dkt. 19, at 7. Sonne does not suggest, and has not provided any evidence to show, that Carrington agreed to provide a safe work environment as a term of his employment agreement. In the absence of a contractual obligation to provide a safe

work environment,[21] Sonne's covenant of good faith and fair dealing claim fails as a matter of law. *Bollinger*, 272 P.3d at 1271 (explaining the covenant of good faith and fair dealing "does not create new duties that are not inherent in the agreement itself," and did not apply even where the employee claimed to have been terminated for raising safety concerns).

For the first time on summary judgment, Sonne also argues Carrington owed him an implied duty to "not command Plaintiff to engage in potentially unlawful or illegal conduct[.]" Dkt. 19, at 8. Yet, Sonne conceded during his deposition that he could not identify anything Carrington asked him to do that was against the law. Dkt. 12-5, at 154:15–19.

Again for the first time on summary judgment, Sonne also argues he discovered, after his deposition, that Carrington violated the covenant of good faith and fair dealing by failing to pay him for 20-25 extra hours he worked for several weeks without compensation. Dkt. 19, at 8. Yet, Sonne did not allege he was deprived of any compensation in his Complaint. Dkt. 1-3. It is improper for a party to allege only one possible theory of recovery in its initial pleading but to then attempt to raise another theory on summary judgment. *Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006). The *Pickern* court explained that raising a new theory on summary judgment violates the pleading standard of Federal Rule of Civil Procedure 8 because the allegations in the complaint must "give the defendant fair notice of what the plaintiff's claim is on the

---

[21] Carrington, like all employers, presumably wanted to provide a safe work environment for its employees. However, the fact that it did not explicitly include such language in its employment agreement is not the only thing that dooms this claim. Even if the employment agreement had included such explicit language, Sonne was unable to identify *any* examples where his own safety was at risk as a result of Carrington's alleged action or inaction. *Supra*, section III.A.3.

grounds upon which it rests." *Id*. at 969 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

Where, as here, the grounds upon which a party seeks to base a claim in a summary judgment brief are distinct from the grounds alleged in the party's initial pleading, "[c]onsidering [the party's] new theories at this point would effectively amend the complaint after the close of discovery and initiation of summary judgment proceedings." *Quality Res. & Servs., Inc., v. Idaho Power, Co.*, 706 F. Supp. 2d 1088, 1096 (D. Idaho 2010). The Court accordingly declines to further consider Sonne's new theories that Carrington breached the covenant of good faith and fair dealing by purportedly ordering him to engage in illegal activity or by failing to pay him for several weeks he allegedly worked without compensation.

In sum, Sonne's breach of the covenant of good faith and fair dealing claim fails as a matter of law.

### C. Unjust Enrichment

"[U]njust enrichment occurs where a defendant receives a benefit which would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust." *Med. Recovery Servs., LLC v. Bonneville Billing and Collections, Inc.*, 336 P.3d 802, 805 (Idaho 2014) (citation omitted). To establish a prima facie claim for unjust enrichment, a plaintiff must show: "(1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Id.* (quoting *Stevenson v.*

*Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 842 (Idaho 2012)).

"A person confers a benefit upon another if he or she gives the other some interest in money, land, or possessions, performs services beneficial to or at the request of the other, satisfies the debt of the other, or in any other way adds to the other's advantage." *Med. Recovery Services, LLC*, 336 P.3d at 805 (quoting 42 C.J.S. *Implied Contracts* § 9 (2013)). While conceding that "his claim for unjust enrichment is nuanced and may not fit perfectly into the legal elements of the typical claim for unjust enrichment," Sonne suggests Carrington was unjustly enriched when it allegedly failed to provide him with a safe work environment. Dkt. 19, at 12. Sonne does not explain how being subjected to a purportedly unsafe work environment could be considered beneficial, or otherwise add, to Carrington's advantage. Nor could Sonne identify any specific instances where his personal safety was at risk. Dkt. 12-5, at 148:18–149:7, 155:15–19.

As Sonne appears to recognize, there is no legal support for his theory that Carrington was unjustly enriched when it purportedly failed to provide a safe work environment. Instead, Idaho law is clear that when an employee has been "compensated with a salary for his services under an enforceable employment contract, and he does not claim that such compensation was unreasonable, he fails to state a claim for unjust enrichment." *Kamden-Ouaffo v. Idahoan Foods, LLC*, 243 F. Supp. 3d 1130, 1137 (D. Idaho 2017), *aff'd* F. App'x 75 (9th Cir. 2020); *see also U.S. Welding, Inc. v. Batelle Energy All., LLC*, 728 F. Supp. 2d 1110, 1116–17 (D. Idaho 2010) ("Because there is an express contract dealing with the essential subject matter of the relationship between the parties, a claim for unjust enrichment cannot apply unless the contract is otherwise

unenforceable.").

Sonne admits that Carrington paid his salary, Dkt. 12-5, at 150:4–7, and does not suggest his employment agreement was unenforceable. *See generally*, Dkt. 1-3. And, while Sonne maintains Carrington was unjustly enriched by his "skills, labor, knowledge and experience" the Court cannot conclude it would be inequitable for Carrington to retain such benefits. *Id*. at ¶ 55. "[A]fter all, the employer's retention of a benefit conferred by an employee, in exchange for a salary, is the essential purpose of the employer-employee relationship." *Kamden-Ouaffo*, 243 F. Supp. 3d at 1137.

In short, Sonne's unjust enrichment claim fails as a matter of law.

**E. Negligent Supervision**

Like negligence, a negligent supervision claim requires a showing of a duty to conform to a certain standard of conduct, breach of that duty, a causal connection between the negligent conduct and the plaintiff's injury, and damages. *Podolan v. Idaho Legal Aid Servs., Inc*., 854 P.2d 280, 288 (Idaho Ct. App. 1993). In the context of negligent supervision, an "employer's duty of care requires that an employer who knows of an employee's dangerous propensities control the employee so that he or she will not injure third parties." *Rausch v. Pocatello Lumber Co*., Inc., 14 P.3d 1074, 1080 (Idaho Ct. App. 2000).

Sonne has not identified: (1) a certain standard of conduct to which Carrington had a duty to perform; (2) how Carrington breached this duty; (3) a causal connection between Carrington's alleged breach and his injury; or (4) any injury he suffered as a result of Carrington's purportedly negligent supervision. Nor has Sonne identified any "dangerous

propensities" of a specific Carrington employee. *Id*. In fact, Sonne acknowledges that "[n]owhere in his claim for negligent supervision does he claim any specific incident as the grounds to support his [negligent supervision] claim." Dkt. 19, at 18. Instead, without any citation to the record, Sonne vaguely asserts he has "provided sufficient evidence in his complaint and through his deposition testimony to establish that Defendant likely failed to protect Plaintiff from the dangerous propensities of Defendant's employees and those dangerous propensities *could have* resulted in great bodily harm or death to Defendant's patients." *Id*. at 18–19 (emphasis added). Sonne's conclusory statement not only falls far short of establishing a genuine dispute of material fact with respect to any of the elements of negligent supervision, but also admits that an injury—to Sonne or anyone else—did not occur.

Because Sonne fails to make a showing with respect to any of the essential elements of a claim for negligent supervision, this claim fails as a matter of law.

### F. Vicarious Liability

In Idaho, "vicarious liability, or respondeat superior, is not a cause of action in itself, but is a means of assigning liability to an employer for the actions of the [employee] as to other common law causes of action." *Bonner v. Alderson*, 2005 WL 2333829, at *19 (D. Idaho Sept. 22, 2005).[22] Because, as explained herein, Sonne has not established the

---

[22] While, in his response to Carrington's Motion for Summary Judgment, Sonne distinguishes the background facts of *Bonner* from those at issue here, the legal principal that vicarious liability is not a stand-alone cause of action, but rather a means of imputing liability to an employer for actionable conduct by its employee, is well-settled. *Jones v. HealthSouth Treasure Valley Hosp*., 206 P.3d 473, 479 (Idaho 2009); *Restatement (Second) of Torts* 429 (1965). Sonne also suggests he "desires for [Carrington] to be held solely liable for the tortious acts of its employees that was carried out within the scope of their employment," but

elements of any viable common law causes of action on which to impute liability to Carrington under the theory of vicarious liability, summary judgment is appropriately granted on this claim as well.

## V. CONCLUSION

In the absence of evidence to establish the elements of his claims for constructive discharge in violation of public policy, violation of the covenant of good faith and fair dealing, unjust enrichment, negligent supervision, and vicarious liability—as well as in the absence of any caselaw or other legal authority to support Sonne's novel interpretation of such claims—Carrington's Motion for Summary Judgment is GRANTED.

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Carrington's Motion for Summary Judgment (Dkt. 13) is **GRANTED in its entirety;**

2. The Court will issue a separate judgment pursuant to Federal Rule of Civil Procedure 58.

DATED: January 16, 2024

David C. Nye
Chief U.S. District Court Judge

---

Sonne has neither established, nor even identified, any specific tortious acts Carrington's employees allegedly carried out. Dkt. 20, at 15; *see also* Dkt. 1-3, ¶¶ 69–73.